UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 12-62328-CIV-ROSENBAUM

ALL LEISURE HOLIDAYS LIMITED,

    Plaintiff,

v.

STEVEN NOVELLO, and DATABASE
MARKETING SOLUTIONS, INC.,

    Defendants.

_____/

### ORDER GRANTING PLAINTIFF'S EMERGENCY
### *EX PARTE* MOTION FOR TEMPORARY INJUNCTION

**THIS CAUSE** is before the Court on Plaintiff's Emergency *Ex Parte* Motion for Temporary Restraining Order ("Motion") [D.E. 4]. Plaintiff, ALL LEISURE HOLIDAYS LIMITED, INC., has also filed a Verified Complaint for Injunctive Relief and for Damages ("Verified Complaint") [D.E. 1], a Memorandum of Law in support of the Motion [D.E. 5], and a Certificate Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure [D.E. 6].

In the Motion and Verified Complaint, Plaintiff requests entry of a temporary restraining order enjoining Defendants, STEVEN NOVELLO ("Novello") and DATABASE MARKETING SOLUTIONS, INC. ("DMS"), from any misappropriation or further misappropriation of All Leisure's Trade Secrets, as defined in the Verified Complaint, requiring Novello and DMS to return all of All Leisure's Trade Secrets, and for other injunctive relief. Having carefully reviewed the Verified Complaint, Motion, Memorandum of Law in support of the Motion, and Certificate, the Court grants in part the Motion without notice.

In the Verified Complaint, Plaintiff alleges the following facts:

Plaintiff All Leisure is also known as "All Leisure Holidays Limited Inc.," "All Discovery Cruising," and "All Discovery Cruising North America." D.E. 1, ¶1. All Leisure is in the business of selling, marketing and operating cruise ships throughout the world. It operates the cruise brands Hebridean Island Cruises, Swan Hellenic, and Voyages of Discovery. *Id.* All Leisure is part of All Leisure Group PLC, its parent company, which is the largest British-owned cruise-ship company in the world. *Id.*

All Leisure has expended considerable money and time developing and maintain proprietary and valuable information, including, but not limited to, business and corporate strategies, business plans, product strategies, product cost and pricing information, customer lists and information, vendor lists, lead lists, lead conversion, lead formation sales reports, operating plans, marketing strategies and plans, methods, financial information, contracts, agreements, computer programs, technical processes, manuals, and other information pertaining to the financial condition, business affairs or business prospects of All Leisure. All Leisure describes this information ("All Leisure's Trade Secrets") as the life blood of All Leisure's business. It appears that dissemination and use of All Leisure's Trade Secrets to and by competitors would allow them to compete better with All Leisure and would significantly impact All Leisure's business operations. D.E. 1, ¶8.

According to All Leisure, one of its most important assets is its customer list and customer information. If this list and information became public or were utilized by All Leisure's competitors, All Leisure submits it would lose both the trust of its customers and the ability to fairly and effectively compete in the marketplace. D.E. 1, ¶9.

It appears that All Leisure's Trade Secrets derive independent economic value from not

being generally known to, and not being readily ascertainable by proper means by, other persons outside of All Leisure and are subject to efforts that are reasonable under the circumstances to maintain the secrecy of the information. D.E. 1, ¶10.

All Leisure took precautionary measures to protect All Leisure's Trade Secrets, including, but not limited to, instituting a data-protection policy, which governed employees' access to All Leisure's Trade Secrets, required the use and updating of passwords, and set forth requirements for storage and physical security (desks, doors, visitors, laptops and storage devices) of such information and data. D.E. 1, ¶11.

Novello joined All Leisure on May 11, 2010, as President. As President, Novello was responsible for the operation of the company throughout North America. D.E. 1, ¶12. During his more-than-two-year tenure with All Leisure, Novello came to know and was entrusted with All Leisure's Trade Secrets. D.E. 1, ¶13.

Prior to and during his employment, All Leisure avers, Novello was advised and aware of All Leisure's data-protection policy. He was further informed and knew that All Leisure's Trade Secrets were to be kept confidential to ensure that such information and data would be used and retained within the company and that All Leisure's Trade Secrets were sole and exclusive property of All Leisure. D.E. 1, ¶14.

On April 1, 2012, DMS, a database marketing and consulting firm that develops marketing campaigns to increase revenue, entered into a Non-Disclosure Agreement with DMS by and through DMS's Vice President, Susan Lee. D.E. 1, ¶15; D.E. 1-3. The Non-Disclosure Agreement prohibits DMS from disclosing or communicating All Leisure's confidential and proprietary information to any third party. D.E. 1, ¶17; D.E. 1-3.

Pursuant to the Non-Disclosure Agreement, All Leisure furnished DMS with All

Leisure's Trade Secrets. DMS acknowledged and agreed that all such information and data is and shall remain the property of All Leisure. D.E. 1, ¶16; D.E. 1-3.

In or about October 2012, Novello made an unannounced decision to leave All Leisure. DMS, however, knew that Novello was leaving All Leisure. D.E. 1, ¶18.

Having decided to leave the company, and without the knowledge of All Leisure, on October 14, 2012, at 9:33 a.m., Novello sent an email to Lee, the Vice President of DMS, stating,

> Can you provide me with a data dump across all offices of all bookings, including cruise revenue, names of pax [passengers], address info, names of agent if any, including address info, booking dates, cruise name, locations, birthdates, emails, that we have in nvs…the raw data will be fine.

D.E. 1, ¶19; D.E. 1-4. A data dump, also known as a database dump, is the transfer of a large amount of data from one system or location to another. D.E. 1, ¶20. Novello's data dump request included data comprising All Leisure's Trade Secrets. D.E. 1, ¶21. Novello's request that DMS transfer All Leisure's Trade Secrets to him personally appears to have been for his own use and benefit and probable use in competition against All Leisure after he left the company. D.E. 1, ¶22.

On October 14, 2012, at 10:52 a.m., Lee sent an email to Novello, which stated,

> Yes. I will pull it today. It's going to be a large file so if I can't zip it and email it to you, I'll put it in a CD and give it to you on Tuesday. Or do you need it before that?

D.E. 1, ¶23; D.E. 1-5.

Two days later, on October 16, 2012, at 6:05 p.m., Novello sent an email to Lee, stating, "Can you zip me the information I requested, as I assume you forgot to give me a CD with it." D.E. 1, ¶24; D.E. 1-6.

Fifteen minutes later, at 6:20 p.m., Lee replied, "Yes, I have it and did forget to burn the CD. I'm going to try and send it to you via YouSendit now." D.E. 1, ¶25; D.E. 1-6.

YouSendit is a digital file delivery company that lets users send, receive, and track files on demand and includes the ability to share folders and sign documents. The sender can enter the recipients' email addresses, attach the file and send it; the recipients receive an email notification with a Uniform Resource Locator ("URL") that allows them download the file. D.E. 1, ¶26.

On October 16, 2012, at 6:27 p.m., Novello sent an email to Lee, stating, "If you cannot, just drop it in the mail to 9407 Bridgebrook Drive, Boca Raton, FL 33496 as I may [sic] from home some days next week." D.E. 1, ¶27; D.E. 1-6. Shortly thereafter, at 6:48 p.m., Lee sent an email to Novello, advising in pertinent part, "It's sending via YouSendit now. Should be receiving it shortly." D.E. 1, ¶28; D.E. 1-6. Two minutes later, YouSendit sent an email to Lee delivering the data files requested by Novello. The link to All Leisure's data files was then sent to Novello so he could access and download All Leisure's data. D.E. 1, ¶29; D.E. 1-6.

Another two minutes after that, Novello sent an email to Lee, opining in pertinent part, "When I do leave, they are screwed because no one will do what I did." D.E. 1, ¶30; D.E. 1-6. The next day, Lee sent an email to Novello agreeing with Novello's sentiment: "I have no doubt that they will be screwed when you're gone." D.E. 1, ¶31; D.E. 1-6.

On October 24, 2012, at 2:47 p.m. Novello again sent an email to Lee, asking, "Any chance I can get this ??" Novello was referring to the "data dump" of All Leisure's proprietary and confidential information and data, which he previously requested from Lee. D.E. 1, ¶32; D.E. 1-6.

A few minutes later, Lee responded in an email, "I sent it to you, remember? You got a file from YouSendit?" D.E. 1, ¶33; D.E. 1-6.

Fifteen minutes after that, Lee sent an email to Novello requesting, "Can you check your

email from last Tuesday [October 16, 2012] at 6:50pm? You should also be able to click on the link below." D.E. 1, ¶34; D.E. 1-6.

At 3:19 p.m., Novello responded by email, "I'm uploading now. . . ." D.E. 1, ¶35; D.E. 1-6.

On October 25, 2012, All Leisure terminated Novello's employment. D.E. 1, ¶37. The day his employment was terminated, Novello purportedly acknowledged that All Leisure maintained confidential and proprietary information and implications could arise if an employee took such information. D.E. 1, ¶38.

According to All Leisure, the data files transmitted to Novello by DMS are All Leisure's Trade Secrets. D.E. 1, ¶36. All Leisure first discovered Novello's and DMS's acts on November 15, 2012, after a search of Novello's company email. D.E. 1, ¶39.

Based on the foregoing information, Plaintiff asserts that Novello and DMS, through improper means, have misappropriated or are immediately likely to misappropriate All Leisure's Trade Secrets. Plaintiff further contends that Novello has disclosed or used or is likely to disclose or use All Leisure's Trade Secrets without the express or implied consent of All Leisure and that DMS still possesses All Leisure's Trade Secrets and has improperly disclosed such information and data to Novello or has used or is likely to disclose or use All Leisure's Trade Secrets for the benefit of itself and others. D.E. 1, ¶46.

## DISCUSSION

Under Rule 65(b), Fed. R. Civ. P., a court may enter a temporary restraining order ("TRO") without notice to the party restrained if certain procedural and substantive requirements are met. To prevail on a motion for a TRO, the movant must establish (1) a likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the

threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest. *Schaivo v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005). To succeed on such a motion without notice, the movant must also demonstrate that immediate and irreparable injury will result before the adverse party can be heard in opposition, and the movant's attorney must certify why notice should not be required. Fed. R. Civ. P. 65(b)(1).

### Likelihood of Success

The Uniform Trade Secrets Act, Fla. Stat. §§ 688.001, *et seq.*, permits injunctive relief to redress any actual or threatened misappropriation of trade secrets. To set forth such a claim, a plaintiff must establish both of the following: (1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy, and (2) the secret it possessed was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it. *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001) (citing Fla. Stat. § 688.002).

Trade secrets are broadly defined under the Florida Uniform Trade Secrets Act and include information that "derive[s] economic value from not being readily ascertainable by others and must be the subject of reasonable efforts to protect its secrecy." *Del Monte*, 136 F. Supp. 2d at 1291. Generally, Florida law considers a business's customer lists and the information contained therein to be trade secrets subject to protection if that information is compiled from non-public information and is kept confidential by the business. *See Marine Turbo Eng'g, Ltd. v. Turbocharger Servs. Worldwide, LLC*, No. 11-60621-CIV, 2011 WL 6754058, at *9 (S.D. Fla. Dec. 22, 2011); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dunn*, 191 F.Supp.2d 1346, 1351 (M.D. Fla. 2002); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v.*

*Hagerty*, 808 F. Supp. 1555, 1558 (S.D. Fla. 1992), *aff'd*, 2 F.3d 405 (11th Cir. 1993) ("Regardless of who compiled the customer list, however, it is clearly protected under *Hapney* [*v. Central Garage, Inc.*, 579 So. 2d 127 (Fla. 2d DCA 1991).]  The *Hapney* court's ultimate holding was that '*trade secrets, customer lists, and the right to prevent direct solicitation of existing customers are, per se, legitimate business interests* subject to protection . . . .'"); *East v. Aqua Gaming, Inc.*, 805 So. 2d 932, 934 (Fla. 2d DCA 2001) (finding customer list compiled, in part, from confidential and non-public information to be a trade secret); *Kavanaugh v. Stump*, 592 So. 2d 1231, 1232 (Fla. 5th DCA 1992) ("Customer lists can constitute trade secrets where the lists are acquired or compiled through the industry of the owner of the lists and are not just a compilation of information commonly available to the public."); *Unistar Corp. v. Child*, 415 So. 2d 733, 734 (Fla. 3d DCA 1982) (finding customer list to be a trade secret where list was "distillation of a larger list of financial planners, reflecting considerable effort, knowledge, time and expense on the part of the plaintiff); *Fortune Pers. Agency of Ft. Lauderdale, Inc. v. Sun Tech Inc. of S. Fla.*, 423 So. 2d 545, 545 (Fla. 4th DCA 1982) (recognizing customer lists as a protectable trade secret).  The information Plaintiff identifies as All Leisure's Trade Secrets likely qualifies as trade secrets under Florida law.

Misappropriation of trade secrets occurs when the trade secret is acquired by a person who knows or has reason to know that the trade secret was acquired by improper means or was disclosed or used without consent by a person who used improper means to acquire knowledge of the trade secret; or at the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was "(a.) [d]erived from or through a person who had utilized improper means to acquire it; (b.) [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (c.) [d]erived from or through a person who owed a duty

to the person seeking relief to maintain its secrecy or limit its use." Fla. Stat. § 688.002(2). Moreover, Florida law specifically provides for injunctive relief against both actual and threatened misappropriation. Fla. Stat. § 688.003; *see also Thomas v. Alloy Fasteners, Inc.*, 664 So. 2d 59, 60 (Fla. 5th DCA 1995); *Stoneworks, Inc., v. Empire Marble & Granite, Inc.*, No. 98-2017-CIV-HIGHSMITH, 1998 WL 998962, at *4 (S.D. Fla. Nov. 20, 1998).

The fact that an employee did not sign a non-disclosure or confidentiality agreement is not dispositive. "The law will import into every contract of employment a prohibition against the use of a trade secret by the employee for his own benefit, to the detriment of his employer, if the secret was acquired by the employee in the course of his employment." *Unistar Corp.*, 415 So. 2d at 734.

The facts as alleged in the Verified Complaint establish that having decided to leave the employ of All Leisure, and without the knowledge of All Leisure, Novello, likely aided and assisted by DMS, apparently requested and obtained All Leisure's Trade Secrets without the express or implied consent of All Leisure. For all these reasons, a substantial likelihood exists that All Leisure will prevail on the merits of its claim.

### Immediate, Irreparable Injury

"[T]he loss of customers and goodwill is an 'irreparable' injury." *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (citation omitted); *see also Marine Turbo Eng'g, Ltd.*, 2011 WL 6754058, at *10 (finding that injuries stemming from stolen trade secrets are "not easily quantifiable in monetary terms" and thus are irreparable); *Hatfield v. AutoNation, Inc.*, 939 So. 2d 155, 157 (Fla. 4th DCA 2006) (finding confidential information gave rise to irreparable harm); *I.C. Sys., Inc. v. Oliff*, 824 So. 2d 286, 287 (Fla. 4th DCA 2002) (characterizing damages as irreparable where use of trade secrets and customer lists were at

stake). Furthermore, when the damages that might be suffered are speculative—as in the case of misappropriated trade secrets—the harm is properly characterized as irreparable because an inadequate remedy at law is presumed. *Dotolo v. Schouten*, 426 So. 2d 1013, 1015 (Fla. 2d DCA 1983).

Plaintiff's emails illustrate that Defendants likely have, or are about to, misappropriate All Leisure's trade secrets. Plaintiff has accordingly demonstrated that it will suffer an immediate, irreparable harm if the TRO is not granted.

### Balance of Injuries

As discussed above, All Leisure has demonstrated the irreparable harm that may result to its business should its trade secrets be misappropriated and used by its competition. The temporary inconvenience that would result to Defendants by precluding their use of this information during the short duration of the TRO is outweighed by the threatened irreparable injury.

### Public Interest

Florida law recognizes that protecting trade secrets furthers the public interest. *Aqua Gaming, Inc.*, 805 So. 2d at 934 ("Finally, as to the fourth prong, it is apparent that an injunction prohibiting a former employee from using trade secrets to solicit existing customers clearly does not disserve the public interest of protecting legitimate business interests."); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Silcox*, No. 01-8800-CIV, 2001 WL 1200656, *6 (S.D. Fla. Oct. 4, 2001) ("Issuance of a preliminary injunction will promote the public interest in: (i) protection of trade secret client lists and other confidential and trade secrets information and (ii) enforcement of reasonable contracts."). The Court concludes that entry of a TRO to protect trade secrets serves the public interest.

**Notice**

As required by Rule 65(b)(1)(B), Fed. R. Civ. P., Plaintiff's attorney has certified the necessity of issuing this TRO without notice. Specifically, he avers that notice to Defendants may result in further dissemination and improper use of All Leisure's Trade Secrets, or may cause Defendants "to delete electronic evidence of their misappropriation." D.E. 6. Given the malleable nature of electronically stored information, the Court finds sufficient cause to support entry of an *ex parte* TRO.

It is hereby **ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Emergency *Ex Parte* Motion for Temporary Restraining Order is hereby **GRANTED IN PART**.

2. Defendants, STEVEN NOVELLO and DATABASE MARKETING SOLUTIONS, INC., are hereby temporarily restrained from using, copying, reproducing, disseminating, distributing, and disclosing all proprietary information and trade secrets of All Leisure, including, but not limited to, customer lists and information, documents and data regarding cruise revenue, names, addresses and contact information of passengers, names, addresses and of agents, including addresses and contact information, booking dates, cruise names, locations, birth dates, emails, business and corporate strategies, business plans, product strategies, product cost and pricing information, vendor lists, lead lists, lead conversion, lead formation sales reports, operating plans, marketing strategies and plans, methods, financial information, contracts, agreements, computer programs, technical processes, manuals, information pertaining to the financial condition, business affairs or business prospects of All Leisure, and all other documents, data and information that they created using the proprietary information and trade secrets of All Leisure.

3. Pursuant to Rule 65(d), Fed. R. Civ. P., this Order is binding on the following who receive actual notice of the Order by personal service or otherwise: Defendants STEVEN NOVELLO and DATABASE MARKETING SOLUTIONS, INC.; their officers, agents, servants, employees, and attorneys; and other persons who are in active concert or participation with Defendants STEVEN NOVELLO and DATABASE MARKETING SOLUTIONS, INC., or their officers, agents, servants, employees, and attorneys.

4. Plaintiff's request that Defendants return the referenced information is **DENIED** without prejudice at this time.

5. This Temporary Restraining Order shall remain in effect for ten (10) days from the date of this Order, until December 7, 2012, unless vacated or further extended by the Court.

6. A hearing on issuing a preliminary injunction in this matter is set for **Thursday, November 29, 2012, at 10:30 a.m.** at the United States Federal Building and Courthouse, 299 E. Broward Boulevard, Courtroom 310-B, Fort Lauderdale, Florida. Plaintiff is instructed to immediately notify Defendants of the preliminary injunction hearing.

7. Under Rule 65(c), Fed. R. Civ. P., Plaintiff shall post a bond in the amount of $5,000.00 with the Clerk of the Court, to cover the payment of costs and damages sustained by the enjoined Defendants if such Defendants are wrongfully enjoined therefrom. The provisions of this Order shall not become effective until Plaintiff posts such bond.

8. Plaintiff shall immediately serve this Order on Defendants and shall file notice

- 13 -

with the Court certifying the date of service.

**DONE AND ORDERED** in Chambers in Fort Lauderdale, Florida, at 8:03 p.m., this 27th day of November 2012.

ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE